UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ESTATE OF SHARON FREESE-PETTIBON *ex rel* CHAD O'MEALY, EXECUTOR & PERSONAL REPRESENTATIVE<br><br>Plaintiff,<br><br>v.<br><br>NEXUS RVs, LLC<br><br>Defendant. | CAUSE NO. 3:18-CV-831 DRL |

OPINION AND ORDER

In early 2017, a couple purchased a new 2017 Nexus Bentley recreational vehicle from Nexus RVs, LLC. Almost immediately they had issues with it and began the process of repairs. Both passed away in just over a year's time—he in December 2017 and she in July 2018—so the son and personal representative pursued this warranty action on the Estate's behalf. Nexus requests summary judgment today. The court grants the motion in part.

BACKGROUND

On February 6, 2017, Sharon Freese-Pettibon and her husband, Dr. Burl Pettibon, purchased a new 2017 Nexus Bentley recreational vehicle from Nexus [102-1 PDF p. 27].[1] They paid $173,427.00. The unit was covered by a one-year limited warranty, which was registered on the purchase date [112-10]. The warranty was good for "normal use against defects in Nexus materials and/or workmanship in construction of the recreation vehicle," outside certain exclusions [*id.*].

The Pettibons took possession of the recreational vehicle on February 6, 2017 in Arizona and drove it home to Washington [102-1 Tr. 38]. On February 15, 2017, Ms. Freese-Pettibon contacted Nexus

---

[1] Both parties at times inappropriately file exhibits *en masse*. The court elects not to strike these exhibits but commends the approach of filing singular exhibits by designation.

regarding some issues with it [*id.* PDF p. 29]. The next day, Nexus contacted All Mobile RV Service about a concern Ms. Freese-Pettibon had about the roof leaking [*id.*]. On February 17, All Mobile RV performed repairs to the roof [*id.* PDF p. 30; 102-2 Tr. 15].

On February 18, Ms. Freese-Pettibon wrote to Nexus President Dave Middleton outlining various issues she noticed with the unit [102-1 PDF p. 30-32]. On February 24, the recreational vehicle arrived at Cordelia RV Center in California for repairs [102-3 Tr. 15-16]. At that time, the Pettibons presented fourteen issues: roof leak, cab heater inoperable, windshield wash inoperable, water for refrigerator not connected, cargo doors out of alignment, passenger side chair not swiveling, furnace fan too loud, deadbolt not lined up properly, debris falling from vents, outside trash door sprung, frame not aligned, DirecTV not working, generator not working properly, and damage to bottom corner of front bumper [*id.* Tr. 42, 45; 112-15 PDF p. 3].

Nexus paid for Cordelia's work [102-3 Tr. 14]. Cordelia's work was completed on March 29, 2017 [*id.* Tr. 17; *see also* 102-7 at 5], though Ms. Freese-Pettibon was "not able to come to California to pick up [the] coach for a while" due to her medical condition [112-15 PDF p. 35]. The unit was returned to the Pettibons in May 2017 [112-17 PDF p. 3].

On June 7, Ms. Freese-Pettibon wrote a second letter to Nexus, saying in part "[i]t is time for Nexus to pick up this coach and return it to the origin and tear it down and build it right for someone" [112-21 at 2]. On June 20, she wrote a third letter to Nexus, this time outlining what she saw as the four paths forward to resolve the ongoing issues [112-22]. Ms. Freese-Pettibon and Mr. Middleton spoke by phone, and Mr. Middleton agreed to extend the Nexus warranty by six months to August 6, 2018 [112-46 Tr. 19, 21-22]. On August 11, 2017, this was formalized in a letter [112-24].

Soon after, the Pettibons took the recreational vehicle on a camping trip. On August 20, Ms. Freese-Pettibon wrote a letter to Nexus saying that many of the defects were not fixed and new ones had arisen [112-25]. She asked Nexus to "take it back to the mother ship and go through it and make it right

2

and return it." On September 16, 2017, Ms. Freese-Pettibon was still frustrated by issues she saw with the unit. In an email to Nexus, she said, "I want this coach picked up and made right by your company. I do not want this coach. This is a lemon. I do not want to deal with this anymore" [112-26].

On September 25, 2017, Ms. Freese-Pettibon's son, Chad O'Mealy (who began handling issues with the recreational vehicle on her behalf due to her medical condition) agreed to work with his parents to provide Nexus a complete repair list of current defects [112-27]. On October 2, he sent Nexus a list of 23 items requiring repair or replacement [112-28].

On October 30, Evergreen Truck & Diesel Repair performed one day of work repairing the unit's generator [102-1 PDF p. 67]. On November 22, Country Canopy & RV Center addressed the city water hookup, shower door, and vents [102-5 Tr. 15-16; *see also* ECF 112-31]. At the end of January 2018, the unit was sent to J&L Recreation Vehicle for additional repairs, with these repairs completed on March 28, 2018 [112-36 PDF p. 3]. On April 27, an invoice was prepared by J&L for these repairs, including fixes to the refrigerator doors, bedroom closet light, shower door, radio, generator, and leveling system [112-35 PDF p. 10-11].

On July 6, Ms. Freese-Pettibon passed away. Her son, Mr. O'Mealy, was named personal representative of her Estate [102-1 PDF p. 26]. This suit ensued and later the Estate hired Tom Bailey, a Class A general contractor trained and certified in Florida, to inspect the unit. He inspected it on July 22 and 23, 2019 [112-38 ¶ 9]. Mr. Bailey catalogued 33 defects that had been reported and concluded that 18 of these defects had not been repaired [102-7; 112-39; 112-38 ¶ 10].[2]

### STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

---

[2] Mr. Bailey also notes that he discovered an additional 48 defects with materials and workmanship, but these were not reported to Nexus. He doesn't enumerate these additional defects or mention them elsewhere.

non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue— a triable issue—exists. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

The court has federal question jurisdiction. The Magnuson-Moss Warranty Act (MMWA) provides the means to assert state law warranty claims in federal court, though the claims remain informed by state law. *See* 15 U.S.C. § 2310(d)(1); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781 (7th Cir. 2011); *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). The parties stipulate to Indiana law on all claims. Seeing no reason to apply another state's law, and presented with no conflict that would require analysis, the court applies Indiana law. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009); *see also McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004).

A. *Express Warranty.*

Under Indiana law, to prevail on an express warranty claim, a plaintiff must prove (1) the existence of a warranty, (2) a breach, (3) causation, and (4) damages. *Celina Ins. Co. v. Indianapolis Roofing & Sheet Metal Corp.*, 953 N.E.2d 679, 679 (Ind. Ct. App. 2011); *see Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 364 (N.D. Ind. 2021). "[A]ny affirmation of fact or promise made by the seller to the buyer [that] relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Ind. Code § 26-1-2-313(1)(a). A seller breaches an express warranty when the goods fail to conform to the warranty, *see Martin v. Thor Motor Coach Inc.*, 602 F. Supp.3d 1087, 1094-95 (N.D. Ind. 2022), or when the warranty's remedy fails its essential purpose, *see* Ind. Code § 26-1-2-719(2); *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021).

"Timely notice of a breach of warranty is a substantive condition precedent to recovery." *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987). The warrantor must be given a reasonable opportunity to cure, often viewed as a reasonable time or a reasonable number of attempts at necessary repairs. *Zylstra*, 8 F.4th at 603, 606; *Litsinger*, 536 F. Supp.3d at 364-65. "Under Indiana law, two chances is not a reasonable opportunity to cure the defects such that the warranty failed of its essential purpose." *Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019) (citing *Gen. Motors Corp. v. Sheets*, 818 N.E.2d 49, 53 (Ind. Ct. App. 2004)). A "reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle, means at least three chances." *Zylstra*, 8 F.4th at 603.

   a. *Repaired Defects.*

Nexus provided a written limited warranty [112-10].[3] The warranty generally afforded one year of coverage for defects in Nexus's materials and workmanship under normal use. First, Nexus argues that 13 of the 33 defects cannot support a warranty claim because they were fixed. In actuality, the record

---

[3] Though unsigned, both sides concur this warranty became part of the basis of their bargain and have relied on it in briefing.

shows indisputably that 14 of the 33 defects were fixed, and another one (bringing the total to 15) the Estate lacks evidence that it wasn't fixed.

Nexus relies on a portion of the Bailey report.[4] Inexplicably, to support the assertion that 13 of the defects were repaired, Nexus lists only nine fixed defects in briefing. The court isn't sure how this list of nine was made. Three of the defects in the company's brief—passenger seat will not swivel, seat switch came apart/broken, and leveling system malfunctions—were marked as *not repaired* in the Bailey report [112-39 at 8, 15]. They also aren't marked fixed in Nexus's summary of defects and repairs [102-8].[5] Furthermore, Nexus's briefing omits seven defects that the Bailey report (and Nexus's summary chart) clearly indicate *were repaired*: refrigerator doors out of alignment, generator not working properly, bottom corner of front cap is damaged, wheels out of alignment, install diamond shield on front cap, dryer doesn't work, and replace solenoid.

The Estate created a summary of repair history chart that is likewise unhelpful [105 at 34]. It misidentifies the defect numbering, omits any citations to the record, omits at least two defects from the list altogether (#22 and #23), and provides inaccurate information. For example, this counsel-made summary says defects #1 and #10 (using Bailey numbers) were not fixed when the Bailey report—on which this summary purportedly relies—says they were.

The Bailey report, as amended by Mr. Bailey's declaration, concedes that 14 of the 33 reported defects were repaired. He also says a fifteenth repair (satellite television) is indeterminate, leaving no evidence that it wasn't repaired.[6] The court thus starts and ends there because nothing disputes its facts.

---

[4] Nexus offers Exhibit G as a portion (pages 1-15) of the Bailey report [102-7] but repeatedly cites to page 16 of the report that it omitted from the record. The court references the full report elsewhere [112-39].

[5] Both the Bailey report and the Nexus summary only list "passenger side switch is broken," so the court sees no separate item on these lists relating to "passenger seat will not swivel" and presumes both are encapsulated in the reports under the former header (as defect #2).

[6] Even so, there was only one opportunity to repair this issue on this record. *See Zylstra*, 8 F.4th at 603; *Mathews*, 931 F.3d at 622.

The Bailey report concludes that the following were repaired: refrigerator doors out of alignment, generator not working properly, bedroom closet light does not work, bottom corner of the front cap damaged, paint bottom corner of the front bumper, wheels out of alignment, install diamond shield on front cap, replace vent lid, cup holder comes out of place, radio cuts off, clothes dryer does not work, replace solenoid, and windshield repair leaking. Mr. Bailey's declaration adds two more repairs to this list, bringing the total to 15: frame twisted/out of alignment in rear and satellite television system (which he cannot say was left unrepaired) [112-38 ¶ 10]. The law gives Nexus three chances to fix warranty defects, and it did. *Zylstra*, 8 F.4th at 603. These 15 issues cannot support a warranty claim for a reasonable jury.

      b. *Two or Fewer Repair Opportunities.*

That leaves 18 issues that on this record remain unrepaired. Of these, and out of the gate, it seems undisputed that the Estate afforded two (or fewer) repair opportunities for 16 issues on this record—all save the cargo doors out of alignment and the roof leak.[7] The Estate tries to create a triable issue by relying on Mr. Bailey's opinion that certain repairs were not made in a reasonable number of attempts, but two attempts (or fewer) at relatively minor repairs aren't enough as a matter of law. *See Zylstra*, 8 F.4th at 603; *Mathews*, 931 F.3d at 622.

The Estate argues that the leveling system defect, though only presented for repair once, presents a safety issue that affects the unit's full use such that this defect and its non-repair breached the warranty. Mr. O'Mealy describes this issue from a road test with Mr. Bailey: "within 100 yards an alarm was going off to the leveling system" and "Tom contacted the leveling system manufacturer, and they deemed the coach to be unsafe to drive. Tom made me turn around and take the RV back and park it." [112-1 ¶ 4]. Nexus doesn't respond to this argument.

---

[7] The Estate overstates the record by listing an inaccurate number of repair attempts for eleven defects in its briefing. *See infra* Part H. Aside from the failure to make reasonable attempts at repairs for these 16 issues, three of the issues are excluded by the limited warranty's plain terms—namely the furnace fan, washing machine, and batteries. The warranty excludes "batteries" and "[a]ppliances and component parts not manufactured by Nexus, including . . . refrigerators . . . [and] furnaces."

7

This portion of Mr. O'Mealy's declaration is the only evidence that the Estate identifies to support its position that the leveling system defect is a major one that affects the full use of the RV. The Estate hasn't shown how this double hearsay (Mr. O'Mealy describing what Mr. Bailey told him the unnamed manufacturer said) is admissible or would be rendered admissible at trial. *See* Fed. R. Civ. P. 56(c) (requiring admissible evidence); Fed. R. Evid. 802. It hasn't pointed to the Bailey materials to indicate that Mr. Bailey could aid in the admissibility of this unnamed manufacturer's statement. *United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019) ("[Though] one expert may rely on another expert's work, he cannot serve as a mere mouthpiece in order to circumvent the Rules of Evidence."). The Estate presents no other evidence to show that the leveling system defect presents a safety issue that affects the unit's full use.

There is no genuine dispute of material fact as to these 16 defects. The record shows that they were presented for repair on two or fewer occasions each. No reasonable jury could conclude otherwise. As a matter of law, two opportunities for repair aren't sufficient to sustain a breach of warranty claim. Summary judgment is granted on these defects.

   c. *Roof Leak.*

The Estate addresses the roof leak separately, which it says was offered for repair four times. In certain portions of its briefing, the Estate cites to the Bailey materials to support this, though Mr. Bailey concludes that the roof leak was offered for repair only once. Elsewhere in briefing the Estate points to different parts of the record to support its argument that the roof leak was offered for repair four times.[8] Nexus relies on Mr. Bailey's conclusion that the roof leak was only offered once and says any effort by the Estate to prove otherwise impeaches its own proposed expert and remains insufficient to create a genuine triable issue.

---

[8] The Estate also quotes and argues about Nexus's reply from the earlier summary judgment briefing, which the court denied with leave to renew. This argument merits no comment.

Rule 702 opinion isn't the end-all-be-all. The court must take all reasonable factual inferences on this record in the Estate's favor. The Estate has adduced evidence that the roof leak was presented for repair at least three times and remains unfixed. First, on February 17, 2017, Nexus arranged for a mobile technician from All Mobile RV to make repairs on the roof leak [102-1 PDF p. 30; 102-2 Tr. 15: 14-15]. Second, from February 24, 2017 to March 29, 2017, the roof leak was presented to Cordelia RV Center for repairs [102-3 Tr. 15-17]. This is the roof leak repair listed in the Bailey report. Third, from late January 2018 to March 28, 2018, Nexus admits that the roof leak was presented to J&L for repair, though it denies that it was a defect and that J&L performed repairs on all the issues presented [112-35 PDF p. 10-11; 112-36 PDF p. 3]. The record shows that the roof leak was offered for repair at least three times and wasn't fixed. Therefore, this claim survives summary judgment.[9]

  d. *Cargo Doors Out of Alignment.*

On this record, the cargo doors were presented for repair three times, but were not fixed [102-7 at 10]. Nexus concedes this [101 at 2]. Because this problem remained unresolved after the third attempt, it can support a claim for breach of warranty. *See Zylstra*, 8 F.4th at 603. This claim too survives summary judgment.

  e. *Time Out of Service.*

The Estate also argues that Nexus failed to repair defects in a reasonable time such that the limited warranty's remedy failed of its essential purpose. Whether a defect was repaired in a reasonable amount of time is a "fact-intensive analysis." *Zylstra*, 8 F.4th at 606. It is not a mere day-for-day calculation because "[u]nlike an automobile, many RVs spend the majority of their time in storage." *Id.* at 606-07. The court may consider the combined time out of service for the defects. *Id.* at 606. The calculation of time out of service includes only warranty work. *See id.* at 608.

---

[9] The court need not reach a conclusion on whether the November 22, 2017 Country Canopy work (which included "seal[ing] roof as needed") [112-31 at 2-3] was a fourth instance of the Estate offering the roof leak for repair or whether the roof leak was a major defect.

The Estate must show its work. *See Zylstra*, 8 F.4th at 606-07. The Estate says this unit was out of service for about 158 days, on which it says a reasonable jury could conclude that Nexus had a reasonable opportunity to cure the defects but failed to do so. The Estate never explains how it reached its "about 158 days" conclusion, only citing to Mr. Bailey's declaration ¶ 10 [(Ex. 38) 112-38], which doesn't mention any number of days out of service; Mr. O'Mealy's deposition pages 62-69 [(Ex. 44) 112-44], which likewise mentions nothing of the sort, and generally to the Bailey report [109 at 33].[10] Nexus also relies on the Bailey report to conclude that the unit was out of service for 73 days. Remarkably, both sides rely on the Bailey report but reach two separate conclusions on this front—and the court cannot help but arrive at a third.

Using the Bailey report, the unit was being serviced from February 24, 2017 through March 29, 2017 for defects #2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 16, 18, 19, 20 (plus #22 was serviced on March 23, 2017 only, and #21 and #23 were serviced on March 29, 2017 only). That's 34 days (inclusive).[11] Defect #4-A was kept for service from March 29, 2017 through April 24, 2017—an additional 27 days, bringing the total to 61 days. There were three additional days of single-day repairs: on October 30, 2017 defect #10-A was addressed; on November 22, 2017 defects #1, 11, 12, 14, 15, 17, 24, 31, 32, and 33 were addressed; and on April 27, 2018 defects #1-A, 2-A, 4-B, 5-A, 6-A, 7-A, 9-A, 10-B, 11-A, 12-A, 14-A, 15-A, 17-A,

---

[10] Throughout its briefing, the Estate unhelpfully cites to entire exhibits as it does here. For example, in its response to fact #25 in the statement of material facts, the Estate cites to Exhibits 15 and 16, with no pincite to guide the court through these 70 pages. The Estate repeatedly cites to Exhibits 38 and 39 together, totaling 180 pages, in its response to facts #41-44. "[I]t isn't the court's job to find the needle in the haystack, the truffle in the field, or the Waldo on the page." *Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 353 (N.D. Ind. 2021). The court will not scour the record without a suitable proffer of material facts or genuine issues. *See* Fed. R. Civ. P. 56(c)(1)(A) (parties must "cit[e] to *particular parts* of materials in the record") (emphasis added); N.D. Ind. L.R. 56-1(b)(2)(C) (party must "cit[e] to evidence supporting each dispute of fact"); *see, e.g.*, *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 547 n. 10 (7th Cir. 2002) ("it is not the responsibility of this court to ferret through the record for support for [plaintiff's] arguments"); *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) ("court is not required to scour the record in search of evidence to defeat a motion for summary judgment") (quotations and citations omitted).

[11] Nexus just miscalculates this as 44 days.

25, 26, 27, 28, 29, and 30 were addressed. That brings the total days out of service to 64 days according to Mr. Bailey.

The court might well be justified to stop here because that is all the Estate cites in briefing, and the Estate has the burden to show its work. *See Zylstra*, 8 F.4th at 606-07. But the court looked deeper. Although the parties rely on Mr. Bailey's report to support their time out of service calculations, their statements of material facts at times seem to disagree with his conclusions on the repairs that occurred at or by All Mobile RV in early 2017, Cordelia RV Center in early 2017, Hasslers Auto Body in summer 2017, Country Canopy in November 2017, and J&L in early 2018; and the court remains mindful to take all reasonable inferences in the Estate's favor, notwithstanding the Estate's missing calculation.

On February 17, 2017, All Mobile RV performed one day of work on the roof leak [102-1 PDF p. 30; 102-2 Tr. 15]. This seems unaccounted by Mr. Bailey. On June 30, 2017, Hasslers performed one day of work to install new hardware on the side compartment doors [102-1 PDF p. 61]. On August 8, 2017, Hasslers performed another single day of work on the power switch on the driver's seat [*id.*]. These also seem to be unaccounted by Mr. Bailey. This brings the total to 67 days.

For Cordelia, Mr. Bailey concludes that the unit was being worked on during the following dates: February 24, 2017 to March 29, 2017 and March 29, 2017 to April 24, 2017 (total of 61 days). The Estate says the unit was at Cordelia from February 24, 2017 to May 2, 2017, which it says totals 91 days. First, the Estate gets the math wrong—this is only 68 days. Second, the Estate doesn't present any evidence to dispute that the repairs were first completed on March 29, 2017 [102-3 Tr. 17; 102-7 at 5], then Cordelia undertook additional repairs that were completed by at least April 24, 2017. In fact, the Estate claims that the unit was still being worked on as late as April 17, 2017 [105 ¶ 33], citing to certain Cordelia emails [112-17], but they show that Cordelia finished the repairs on April 19, 2017. Indeed, the Cordelia service manager writes, "we have finished Pettibon's unit" [112-17 at 2]. Rather than prove up the Bailey report,

11

the Estate actually reveals that his calculation adds five days not supported by today's record (April 19 to April 24).[12] This brings the total days out of service down to 62 days.

For Country Canopy, the Bailey report concludes that it was a one-day repair (November 22, 2017), though the Country Canopy president admitted that it was about six to ten hours of work spread over three days [112-32 Tr. 13, 20]. The court thus adds the two days that the Bailey report seems to omit taking all reasonable inferences in the Estate's favor—moving the calculation to 64 days.

For the J&L repairs, the Estate leaves the record nearly indecipherable. The Bailey report concludes that the J&L repairs took just one day (April 27, 2018). That said, at one point the Estate says the unit arrived at J&L in late January 2018 for repairs,[13] citing to Nexus's managing member's testimony that the company brought the unit to J&L in January 2018 [112-45 Tr. 66-67]. Nexus contests this fact, but the company admitted at one point that the unit had arrived at J&L that month [105 ¶ 38]. The problem—the Estate never says or substantiates how many days J&L worked on the unit, or to what extent the unit was out of service for repairs or kept because of the winter months. The parties agree that J&L completed repairs on March 28, 2018 [102-6 Tr. 20; 112-36 at 3]. Again the court might well be within its right to stick the Estate to its argument—that the Bailey report identifies only one day out of service—and that would make the total only 65 days. But even assuming J&L performed repairs over the entirety of the end of January to March 28, 2018, the total would only be 122 days (64 days plus an additional 58 days from January 30, 2018 to March 28, 2018).

---

[12] The unit wasn't returned until May, but that was because Ms. Freese-Pettibon was unable to pick it up due to health issues [112-15 PDF p. 35; 112-17 PDF p. 3].

[13] Elsewhere, the Estate seems to pick a different set of dates for J&L's repairs: "Plaintiffs do not dispute that J&L Recreational Vehicle performed service work on the RV from April 27, 2018 to June 21, 2018 for nineteen separate items. See J&L Recreational Vehicle Repair Records (Plaintiff's Exhibit 35)." [109 ¶ 40]. Exhibit 35 includes a J&L invoice dated April 27, 2018 and stamped as paid on June 21, 2018 [112-35 at 10]. Nothing in sound reason supports the idea that work being invoiced on April 27, 2018 only just began on April 27, 2018, particularly when the invoice already shows the hours of work performed.

Relying on the Bailey report alone as the parties do, this recreational vehicle was out of service for 64 days. Giving the Estate the benefit of digging through all the evidence, no reasonable jury could say the unit was out of service for more than 122 days. The *Zylstra* plaintiffs calculated 230 days before the court whittled it down to 153 days and concluded that this time out of service could not have caused the warranty's remedy to fail its essential purpose. *See Zylstra*, 8 F.4th at 606-09; *see also Pattee*, 2022 U.S. Dist. LEXIS 49490 at 36; *Litsinger*, 536 F. Supp.3d at 370. No reasonable jury could say 64 days or even 122 days spent addressing 33 issues was unreasonable or caused the warranty to be breached or its remedy to fail its essential purpose, not for a nearly $200,000 unit.

      f.  *Actions Allegedly Voiding Warranty.*

Nexus argues that the court should enter summary judgment on the breach of warranty claims because Ms. Freese-Pettibon's use of the unit voided the limited warranty. Nexus says the warranty only warranted the unit for normal use, like recreational travel and camping, but not fulltime use. Nexus presents no facts or citations to the record to support the assertion that the Pettibons used the recreational vehicle fulltime. In fact, Mr. O'Mealy's declaration supports the opposite conclusion: "They never used the RV as a full-time residence." [112-1 ¶ 3]. The court denies summary judgment for Nexus on this theory.

Alternatively, Nexus argues that the warranty specifically states that service on the unit by an unauthorized party voids the warranty, so Ms. Freese-Pettibon's solicitation of Country Canopy to do repairs on it without notifying Nexus, without Nexus's input, and without Nexus's authorization voided the warranty. Again, Nexus doesn't cite to the record at all in its briefing for this section. In response, the Estate points to ample evidence: Nexus admitted that it made Country Canopy an authorized dealer at Ms. Freese-Pettibon's request [(Ex. 42) 112-45 Tr. 53-54, 81-82]; after Mr. O'Mealy notified Nexus of the Country Canopy repairs, a Nexus representative said she understood the need for the repairs and began scheduling additional warranty repairs [112-33]; and later Nexus recommended that Mr. O'Mealy

take the unit back to Country Canopy for warranty repairs [(Ex. 46) 112-49 at 3]. A jury could reasonably conclude that Nexus authorized the work by Country Canopy.

  B. *Implied Warranty.*

"Unless excluded or modified (IC 26-1-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ind. Code § 26-1-2-314(1). "As we have interpreted Indiana law in the past, just as with a claim for breach of an express warranty, a buyer must give the warrantor a reasonable opportunity to cure any alleged defect in order to make a claim of breach of an implied warranty." *Zylstra*, 8 F.4th at 609 (citing *Matthews*, 931 F.3d at 623). The Estate argues that the unit was unmerchantable when purchased, and Nexus says the unit was merchantable. The court reaches the same conclusion here as with the express warranty claim. A reasonable jury could say a recreational vehicle with a persisting roof leak (aside from unaligned cargo doors) was not fit for its ordinary purpose to travel upon our country's roadways.

  C. *MMWA.*

The MMWA "does not provide an independent basis for liability; it only provides for federal jurisdiction for [the] state claims." *Priebe*, 240 F.3d at 587. An MMWA claim rises and falls with the underlying state law claim. *Id.* This federal avenue survives for the same reasons as the state law warranty claims survive. *See* 15 U.S.C. § 2310(d) (private action for a consumer who is damaged by a supplier or warrantor's failure to comply with "any obligation under [the MMWA], or under a written warranty, implied warranty, or service contract, may bring suit for damages").

  D. *Revocation of Acceptance.*

Under Indiana Code § 26-1-2-608(1), a buyer "may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it." Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the basis for it. Ind. Code § 26-1-2-608(2). Nonwritten notice or equivocal notice of revocation isn't

sufficient. *De Voe Chevrolet-Cadillac, Inc. v. Cartwright*, 526 N.E.2d 1237, 1240 (Ind. Ct. App. 1988). Merely complaining about the quality of the goods, without more, doesn't adequately inform the seller the buyer has revoked. *Id.*; *see also Smith v. Nexus RVs*, 468 F. Supp.3d 1012, 1027 (N.D. Ind. 2020).

According to the commentary to Indiana Code § 26-1-2-608, the content of the notice "is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment." More than "mere notification of breach" is required. *Id.* At minimum, the notice should clearly indicate that the buyers view their contractual obligations as having been terminated because of the product's nonconformity and that the buyers wish to return the product. *See* White, Summers, & Hillman, *Uniform Commercial Code* § 9:19 (6th ed.) ("The notice must inform the seller that the buyer does not wish to keep the goods . . . [but] it need not be 'formal.'"). Revocation of acceptance purports to thrust the product back on the seller and thus triggers an altogether different remedy than mere damages—rescission—so the notice should be commensurate with the remedy's significance and avoid undue surprise or equivocation. *See Smith*, 468 F. Supp.3d at 1027.

The Estate argues that reasonable jurors could conclude that it revoked acceptance multiple times in a series of five letters Ms. Freese-Pettibon wrote to Nexus. Nexus argues that these letters are equivocal or mere negotiation, without meeting the requirements of a notice of revocation.

First, the Estate says Ms. Freese-Pettibon gave sufficient notice of revocation of acceptance on February 18, 2017 when she wrote that she would "not accept this vehicle back" because of the various defects and asked Nexus to replace it with a new recreational vehicle [(Ex. 14) 112-14 at 4]. She also asked Nexus to "intervene on our behalf with Ally to change the contract to delay payment until we receive the new rig. If that is not possible we then will be in discussion as to our next step" [*id.* at 4-5]. No reasonable jury could see this as unequivocal revocation. Ms. Freese-Pettibon said that she would not accept the vehicle back, but also opened the door to future negotiations should her demands fail. Equivocal notice of revocation isn't sufficient. *See De Voe Chevrolet-Cadillac*, 526 N.E.2d at 1240.

15

Second, the Estate says Ms. Freese-Pettibon revoked on June 7, 2017 when she asked Nexus to take the unit back and give her money back [(Ex. 21) 112-21 at 2]. She wrote, "[i]t is time for Nexus to pick this coach up and return it to the origin and tear it down and build it right for someone" and "[i]t is our profound wish and hope that we can settle this matter between the parties" [*id.* 3]. Again, this is not an unequivocal revocation. Ms. Freese-Pettibon invited negotiation and failed to revoke. Her efforts to deal evince nothing more than dissatisfaction.

Third, Ms. Freese-Pettibon renewed her request to Nexus to retrieve the unit on June 20, 2017 [112-22 at 1]. In this letter she also wrote, "[w]e remain hopeful of a solution acceptable to both sides of this issue" and "[w]e are sending you this information for your proposal […] for our settlement purposes" [*id.* 1-2]. She outlined various options for moving forward, including fixing the unit [*id.* 3]. Again, Ms. Freese-Pettibon invited Nexus to negotiate to reach a settlement—she did not unequivocally revoke. No reasonable jury could say otherwise.

Fourth, Ms. Freese-Pettibon asked Nexus to take the recreational vehicle to its factory for repairs on August 20, 2017 [112-25 at 1]. She wrote, "take it back to the mother ship and go through it and make it right and return it." Sending the unit for repairs, to be returned later, is not revocation—by definition. Again, no reasonable jury could say otherwise.

Fifth, Ms. Freese-Pettibon again requested Nexus retrieve the recreational vehicle on September 16, 2017 [112-26 at 1]. She wrote, "I want this coach picked up and made right by your company. I do not want this coach. This is a lemon. […] come and get it before winter sets in and repossess it/reclaim it or whatever term you wish to call it." A reasonable jury could find that this is an unequivocal notice of revocation. Nexus offers no other argument to view this notice as untimely or insufficient. Accordingly, the court denies Nexus's motion on the revocation remedy.

    E.   *Limitation on Damages.*

Under Indiana Code §§ 26-1-2-715(1-2), a buyer may normally recover, in addition to warranty damages, incidental and consequential damages resulting from a seller's breach. *See Michiana Mack, Inc. v. Allendale Rural Fire Prot. Dist.*, 428 N.E.2d 1367, 1372 (Ind. Ct. App. 1981). A seller may limit the buyer's remedies, including consequential and incidental damages. Ind. Code §§ 26-1-2-719(1-3). When a warranty's remedy fails of its essential purpose, regardless of the limitation, a plaintiff is often entitled to all remedies available to her under the commercial code. Ind. Code § 26-1-2-719(3); *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning*, 746 N.E.2d 941, 947 (Ind. 2001).

The limited warranty here includes a section titled, "WHAT IS NOT COVERED BY LIMITED WARRANTY" [112-10 at 1]. Included in the list is "[t]ransportation to and from service center or manufacturing locations, [or] any consequential and/or incidental expenses such as, but not limited to, loss of time, commercial loss, loss of use, towing charges, lodging food, phone calls, inconvenience, bus or plane fares, rental charges or storage fees" [*id.*]. The Estate argues that the language makes clear that this exclusion applies to the limited warranty only.

This court has considered the same limitation language in other Nexus contracts before, saying "this warranty isn't written to exclude consequential damages under any theory of recovery as some warranties are—only what is recoverable or not recoverable 'by limited warranty.' There is no language in the warranty that excludes consequential damages based on another theory, including tort." *Smith v. Nexus RVs*, 2021 U.S. Dist. LEXIS 61538, 4 (N.D. Ind. Mar. 31, 2021); *see also Massey v. Nexus RVs*, 2023 U.S. Dist. LEXIS 134258, 24-25 (N.D. Ind. June 30, 2023). This warranty operates no differently—the exclusion only applies to incidental or consequential damages recoverable under a warranty theory. *Smith* permitted the argument for consequential damages to proceed on a tort-based theory alone, not one based on the UCC. No tort-based theories exist in this case. Accordingly, the Estate may not seek incidental and consequential damages resulting from the breach.

F. *Show Cause.*

Unhelpful briefing in what should be simple recreational vehicle warranty cases can be wearisome and detract from the court's economy, even as the court works to give full deliberate consideration to every case—as each is important. *See Litsinger*, 536 F. Supp.3d at 344. What cannot be tolerated are misrepresentations of the record. Parties should know that the court will examine the record closely.

The Estate inexplicably lists a slew of seemingly inaccurate number of repair attempts for 11 defects in its briefing [106 at 6-7], citing to Mr. Bailey's declaration ¶ 10 (which doesn't mention the number of repair attempts) and the RV Problem Analysis chart in the Bailey report. For instance:

- The Estate says the passenger side chair switch had four repair attempts. The Bailey report, which again was cited to support the Estate's assertion, shows that the passenger side chair switch was attempted to be repaired twice: once beginning on February 24, 2017 and again on April 27, 2018. Query whether there is any reasonable way to read the Bailey report to conclude that there were four repair attempts on this issue.

- For the cargo doors out of alignment defect, the Estate says there were four repair attempts, but the record the Estate's brief relies upon shows just three attempts.

- For the cab heat inoperative defect, the Estate says there were three repair attempts, but the record the Estate's brief relies upon shows just two attempts.

- For the windshield washer inoperative defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just two attempts.

- For the water line to refrigerator not connected defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just two attempts.

- For the furnace fan loud defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just one attempt.

- For the plastic debris coming out of air vents defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just two attempts.

- For the deadbolt misaligned defect, the Estate's brief says that there were two repair attempts, but the record the Estate's brief relies upon shows just one attempt.

- For the frame twisted defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just one attempt.

- For the satellite television system inoperative defect, the Estate's brief says there were three repair attempts, but the record the Estate's brief relies upon shows just one attempt.

- For the leveling system not functional defect, the Estate's brief says there were two repair attempts, but the record the Estate's brief relies upon shows just one attempt.

The Estate repeats these assertions elsewhere in briefing [106 at 9]. The Estate reports that Nexus had at least three opportunities to cure the following defects: excessive noise from heater fan, plastic debris coming out of vents, refrigerator water line inoperative, cab heater inoperative, windshield washer inoperative, frame twisted, and satellite television system inoperative. The Estate again cites to Mr. Bailey's declaration ¶ 10 (which doesn't mention the number of repair attempts), Mr. O'Mealy's deposition page 62-69 (same), and the RV Problem Analysis chart in the Bailey report (which does not seem to support the Estate's conclusions). In fairness, it seems on this record that Nexus may have made a mistake or two at times, but notably it was always a mistake against its interest.

The Estate says this unit was out of service for about 158 days, on which it says a reasonable jury could conclude that Nexus had a reasonable opportunity to cure the defects but failed to do so. The Estate never explains how it reaches its conclusion, and even the court's tedious walk through the evidence beyond what the Estate cites in briefing seems to reveal this 158 days is wishful thinking. The court notes that Nexus made a small mathematical error in relying on the Bailey report alone, but that error was easy to identify and to Nexus's detriment in truth, not to its benefit. The court cannot envision why it proves difficult for the Estate to provide a simple calculation with reference to the evidence and with precise citations, without contradicting itself later.

It isn't just the number of repair attempts. In responding to the statement of material facts #40, the Estate cites generally to Exhibit 35 to support its assertion that J&L performed service work on the recreational vehicle from April 27, 2018 to June 21, 2018. The court combed through these 16 pages looking to corroborate the assertion that the repairs lasted until June 21, but this date references when

19

the invoice was paid. A completion of repairs date appears nowhere in this exhibit. Further, this contradicts the Estate's own fact #54 (its first fact #54 on page 29 of its response to Nexus's statement of material facts—the Estate inexplicably restarts numbering from fact #54 on page 31). There, the Estate asserts that the J&L repairs were completed on March 28, 2018.

These examples suffice for today's point. Errors occur at times, and perhaps even today the court has overlooked an explanation hidden in these exhibits. One or two, or maybe even three mistakes of this nature might be chalked up merely as mistakes, or four or five could be easily characterized as just plain sloppy, but when such representations persist well beyond that and then are used to support an argument knowing that, for instance, the precise number of repair attempts matter under the law, it becomes tougher to see an innocent explanation. So there is cause to ask. *See Litsinger*, 536 F. Supp.3d at 344 ("the next case won't be presented this way without consequence"). The court will order the Estate to show cause why it should not be sanctioned for misrepresenting the record and delaying this court's consideration of all its important matters, including this one.

## CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART Nexus's motion for summary judgment [100]. The court GRANTS summary judgment on the express warranty, implied warranty, and MMWA claims, save for those related to the roof leak and cargo doors. For remedies, the court GRANTS summary judgment for Nexus on incidental and consequential damages but DENIES summary judgment as to the Estate's revocation remedy. A trial date will be set by separate order. The original Rule 702 motions to exclude will be addressed as appropriate, without need for the parties to refile [99]. The court ORDERS the Estate and its counsel to show cause by November 28, 2023 why they should not be sanctioned for their representations of the record.

SO ORDERED.

November 7, 2023  *s/ Damon R. Leichty*
　　　　　　　　　　　　　　　　　　　　　　Judge, United States District Court